Joyce **SUBER,** Plaintiff,

v.

**SEMINOLE COUNTY, FLORIDA,** Defendant.

No. 97–907–CIV–ORL–22A.

United States District Court, M.D. Florida, Orlando Division.

March 17, 1999.

---

John V. Head, John V. Head, P.A., Orlando, FL, for Plaintiff.

David V. Kornreich, Jeffrey E. Mandel, Teresa A. Herrmann, Muller, Mintz, Kornreich, Caldwell, Casey, Crosland & Bramnick, P.A., Orlando, FL, for Defendant.

## ORDER

CONWAY, District Judge.

This cause comes before the Court for consideration of Defendant Seminole County, Florida's ("County") Motion for Summary Judgment (Doc. 27) and Plaintiff

Joyce Suber's Response (Doc. 38). Plaintiff seeks damages for alleged age and gender discrimination and for violation of her property rights under the Fourteenth Amendment.

## I. Facts

Plaintiff began her employment with the County on August 24, 1987 as the County's Property Acquisition Coordinator in the County's Engineering Division of the Public Works Department. In this position, Plaintiff was responsible for negotiating, coordinating and closing land acquisitions, sales and leases for the County. In addition, she was directly responsible for supervising the Property Acquisition Staff and for managing outside acquisition consultant contracts. For instance, Plaintiff was responsible for making sure that the property acquisition consultants were properly performing the services for which they were being paid by the County.

For approximately the first six months of her employment, Plaintiff reported to Project Engineer Frank Van Pelt. Deposition of Joyce Suber (Doc. 29) at 69–70. Thereafter, Plaintiff reported to Assistant County Engineer Burt Johnson, who, in turn, reported to Division Manager Jerry McCollum. *Id.* McCollum reported to Department Director Larry Sellers. *Id.;* Deposition of Jerry McCollum (Doc. 32) at 3. Sellers reported to Deputy County Manager Kevin Grace, who reported to County Manager Ron Rabun. (Doc. 29 at 69–70).

As the County Manager, Rabun reported to an elected Board of County Commissioners. Under the County Charter, Rabun served as the County's Chief Operating Officer, and was vested with final authority over all personnel matters. The Board of County Commissioners had no authority to take employment action (other than the approval of the appointment of Department Heads) with respect to individuals who reported, either directly, or indirectly, to the County Manager. *Id.* at 72; Deposition of Ron Rabun (Doc. 30) at 4–8.

In 1996, Plaintiff's ex-husband, Bill Suber, ran for re-election as the Seminole County Property Appraiser. (Doc. 29 at 262). On August 28, 1996, Plaintiff received a telephone call from an anonymous person who asked her if allegations concerning abuse during their marriage were true. *Id.* at 641, 643–44. Upon Plaintiff's confirmation of the allegations, the caller asked Plaintiff to put her allegations in writing and fax them to him. *Id.* Plaintiff did so in a letter addressed to "Dear Voter." *Id.* Thereafter, a letter containing substantially the same information was sent to 4,500 Seminole County voters. *Id.* The letter contained the heading "Joyce Suber," was addressed to "Dear Voter," and was dated August 28, 1996. *Id.*

On September 3, 1996, Rabun received two letters from Andrea Dennison, who had worked on Bill Suber's campaign, alleging that Plaintiff had utilized County equipment to write the August 28, 1996 letter. (Doc. 30, Exh. 4). Additionally, Dennison alleged that Plaintiff had improperly used her position to raise money for her son's political campaign. *Id.* Rabun also received a "whistle-blower" complaint from Attorney Emory Rosenblum, which raised issues relevant to the conduct of Plaintiff in her role as the County's Property Acquisition Coordinator. *Id.* at 11. As a result of these complaints, Rabun initiated an investigation into Plaintiff's conduct. *Id.* at 10.

To conduct the investigation, Rabun selected Deputy County Manager Cindy Coto and Deputy County Attorney Lonnie Groot. *Id.* at 14. Rabun testified that he chose individuals outside of the Public Works Department, in part, because he believed that a greater degree of objectivity would exist. *Id.* at 15. Accordingly, Rabun sent Coto and Groot a memorandum dated September 4, 1996 outlining the conduct to be investigated. *Id.,* Exh. 5. Specifically, the matters to be investigated were described as follows:

> (1) Contributions made by County consultants and County employees to the

campaign of Ms. Suber's son, Mr. James E. Lester, for Property Appraiser of Gulf County.

(2) The propriety and validity of right-of-way settlements made by Ms. Suber including, but not limited to, any audit of the matters involving right-of-way acquisition and Ms. Suber's relationships with consultants involved in that process.

(3) The conduct of Ms. Suber with regard to her duties and responsibilities as Property Acquisition Coordinator including, but not limited to, the appropriateness of Ms. Suber's supervision of employees in her office. *Id.*

On the same day, Rabun sent Plaintiff a memorandum notifying her of the investigation and provided her with a copy of the memorandum sent to Groot and Coto. *Id.,* Exh. 6. Rabun directed Plaintiff not to discuss any matter relating to the investigation with any supervisor, subordinate, or consultant. *Id.*

Groot and Coto began their investigation on September 6, 1996. (Doc. 29 at 528–29). First, they notified Plaintiff of the investigation and discussed the fact that Rabun had instructed her not to discuss any matter relating to the investigation. *Id.* Then they interviewed several individuals, including Assistant County Property Acquisition Coordinators Mitchell Burke and Sabrina O'Connor [1] and Plaintiff. (Exh. 4 at 174). After conducting the interviews, Groot and Coto allowed Plaintiff an opportunity to respond to the information that had been gathered. *Id.*

On October 2, 1996, Groot and Coto issued a 17–page report detailing the findings of their investigation of Plaintiff and concluded that Plaintiff committed the following offenses of the County's Personnel Policies and Procedures and other County Codes relating to procurement: (1) Insubordination; (2) Fraud or Dishonesty; (3) Conflict of Interest; (4) Misuse of County Time; (5) Misuse of County Equipment; (6) Abuse or Violation of County Policies; (7) Harassment or Abuse of Rights of Other Employees; (8) Gifts and Gratuities; (9)

Code of Conduct; and (10) False Statements. (Exh. 4 at 174–75). Specifically, the investigation revealed, *inter alia,* the following:

(1) Violation of Section 400–009–03–1–E—Fraud or Dishonesty (Major Offense) and Section 400–009–03–2–F—Misuse of County Time (Lesser Offense). Plaintiff's son, Jamie Lester, was running for the office of Property Appraiser of Gulf County. On July 17, 1996, from approximately 1:30 p.m. until 4:15 p.m., Burke, O'Connor, Plaintiff, and employees of the American Acquisition Group, one of the County's consultants, spent the majority of their time eating pizza and working on Lester's campaign. Plaintiff did not have prior approval from her supervisor to engage in personal business on County time, and neither she nor her subordinates took leave to work on the campaign. Plaintiff initialed a timecard affirming that both she and Burke worked their entire scheduled shifts on July 17. In addition, Plaintiff did not prevent O'Connor from being paid for a full day. Burke and O'Connor "indicated that they knew their actions were inappropriate, but felt that they had limited choices as they were directed by their supervisor to work on the campaign and stated that Ms. Suber could make your life very difficult if you failed to do as you were directed." *Id.* at 179–81.

(2) Violation of Section 400–009–03–02–0—Gifts and Gratuities (Lesser Offense). During Plaintiff's employment with the County, she received numerous gifts from vendors doing business with the County and participated in an excessive number of lunches paid for by consultants. In addition, she used consultants to conduct personal errands. *Id.* at 184–85.

(3) Violation of the Code of Conduct. During Plaintiff's romantic relationship with Robert Britt, Plaintiff approached her supervisors, who were unaware of

---

1. Plaintiff supervised Burke and O'Connor.

the relationship, and secured approval for Britt to provide building board-up services to the County. On other occasions, Plaintiff would provide Britt with jobs that were not sent out for competitive bids. *Id.* at 184.

(4) Violation of 400–009–03–E—Leaving Assigned Work Area (Lesser Offense), 400–09–03–F—Misuse of County Time (Lesser Offense), and 400–009–03–0—Personal Use of County Property (Lesser Offense). During work hours, Plaintiff and O'Connor took a County van to visit a vendor in the Lemon Bluff area for the express purpose of paying for and picking up a satellite card for Plaintiff's son. *Id.* at 183.

(5) Violation of Section 400–00–9–03–1–A—Insubordination (Major Offense). Notwithstanding an order from Rabun not to discuss any matter relating to the investigation with any supervisor, subordinate, or consultant, Plaintiff contacted O'Connor and asked her questions about her interview. She also contacted others about the investigation. *Id.* at 185.

(6) Violation of Section 400–009–03–2–L—False Statements (Lesser Offense). During Plaintiff's interview, she stated that she worked on her son's campaign for 15 to 30 minutes. This account was not substantiated by five other witnesses who were involved. *Id.* at 180–81.

The report also expressed concern about Plaintiff's lack of separation between personal and business relationships. *Id.* at 183. The report noted that this lack of separation has "led to some of the abuses such as directing subordinates to work on her son's political campaign while on County time, inappropriate utilization of a County vehicle and causing an employee to accompany her on County time to visit a vendor in the Lemon Bluff area to pay for her son's satellite dish." *Id.*

After receiving the report, Rabun sent it to Sellers with instructions to review the report and take any action he deemed necessary. (Doc. 31 at 63). Thereafter, Sellers met with McCollum and instructed him to read the report and recommend a proper discipline.[2] *Id.* After reviewing the report and testimony from the witnesses, McCollum recommended that Plaintiff be terminated. (Doc. 32 at 7–8). Sellers concurred in the recommendation. (Doc. 31 at 14). He testified that "[u]nder county policy, and after my review, it was clear to me that the actions of Miss Subers' as it related to her employment were sufficient violations of county policy to warrant termination." *Id.* at 13–14.

On October 9, 1996, McCollum prepared a disciplinary action form notifying Plaintiff of her proposed termination from employment for cause. (Exh. 4 at 11–15). The Notice of Proposed Termination from Employment provided Plaintiff with an opportunity to show cause why she should not be termination from employment. *Id.* On October 17, 1996, Plaintiff and her attorneys met with Sellers and McCollum to present evidence on Plaintiff's behalf. In addition, Plaintiff provided Sellers and McCollum with a response, including exhibits, detailing why she should not be terminated. *Id.* at 33–43. On October 21, 1996, Plaintiff supplemented her response in further support of her position. *Id.* at 44–55. After considering the information presented to them, McCollum and Sellers made the decision to terminate Plaintiff's employment effective October 24, 1996. *Id.* at 11.

Pursuant to County Policy, this decision was subject to review by the Appeal Hearing Board and the County Manager. Accordingly, Plaintiff appealed her termination to the Seminole County Appeal

---

2. Section 400–009–03–1 of the County's Personnel Policies provides that "major offenses are considered to be so serious in nature that termination for cause is appropriate without regard to the employee's length of service, prior conduct and performance record." (Exh. 4 at 175). Section 400–009–03–2 provides that "lesser offenses are generally instances of improper conduct, requiring lesser degrees of disciplinary action for the first offense. Lesser offenses, however, even for the first offense does not preclude termination for cause, dependent upon the circumstance of the offense." *Id.*

Hearing Board. Pretrial Statement (Doc. 56), ¶ 9(25). An evidentiary hearing was scheduled for January 6, 1997. *Id.* Prior to the hearing, Plaintiff, through her attorneys, submitted a statement of position, exhibits, and a witness list. *Id.* The County, through its counsel, also filed documents in support of its position. *Id.* On December 23, 1996, acting County Human Resources Director Carol Ann Dove sent notices to both parties' witnesses notifying them that they had been requested to appear at Plaintiff's January 6, 1997 hearing. *Id.* She did not compel any of the witnesses to appear. *Id.*

The hearing took place as scheduled on January 6, 1997. (Doc. 29, Exh. 6). The Appeal Hearing Board consisted of the following voting members: Current Planning Manager John Dwyer, Planning Technician III Jackson Heinzelman, Recreation Supervisor Paul Kobylarz, Secretary Marie–Louise McIntosh, Accountant Barbara Voltoline, and Tradesworker Larrie Fossitt. *Id.* The Board also included Deputy County Manager Kevin Grace and counsel to the Board, Ann Colby, neither of whom voted. *Id.* Plaintiff and her attorneys appeared at the hearing. *Id.* The County called Groot, O'Connor, Burke, McCollum, and Sellers as witnesses. *Id.* Plaintiff cross-examined the County's witnesses and was given the opportunity to present witnesses of her own. *Id.* However, she chose not to testify or call any witnesses. *Id.* In its Recommended Summary of Findings and Determination, the Appeal Hearing Board concluded that Plaintiff's termination from employment was warranted based upon her violations of the Seminole County Personnel Policies and Procedures. *Id.*

Shortly after the hearing, Sellers explained to Plaintiff that Grace told him that he thought that Sellers took appropriate action and that he would have fired Plaintiff had Sellers decided not to. Plaintiff immediately brought this information to her attorneys' attention. Subsequently,

on February 11, 1997, pursuant to County policy, Plaintiff's attorneys filed exceptions to the Appeal Hearing Board's Recommended Summary of Findings and Determination for review by Acting County Manager Gary E. Kaiser. Plaintiff did not raise any issue regarding the fact that Grace served as the Chairman of the Appeal Hearing Board. Kaiser thereafter approved the Appeal Hearing Board's Recommendations and upheld Plaintiff's termination from employment on June 3, 1997.[3] (Exh. 6).

Plaintiff subsequently filed this action in Circuit Court of the Eighteenth Judicial Circuit on June 26, 1997 raising claims of harassment and wrongful termination. The case was removed to this Court on July 21, 1997. (Doc. 1). The Court then remanded Plaintiff's state law claims back to the Eighteenth Judicial Circuit. (Doc. 18). Count I of the Amended Complaint alleges that Plaintiff was terminated based on her age. In Count II, Plaintiff claims that she was deprived of the "equal protection under the law with respect to Plaintiff's property right in her job and the property rights of her to be treated equally and fairly under the policies and procedures of Seminole County pursuant to such procedures and as required under … Federal law." (Doc. 23, ¶ 27). In Count III, Plaintiff contends that she was wrongfully terminated "based upon sexual harassment and retaliation for her refusal to accede to such harassment."[4] *Id.*, ¶ 33.

The majority of Plaintiff's claims focus on her allegations of sexual harassment and related conduct. In this regard, Plaintiff asserts that she was routinely greeted with a hug and a kiss on the cheek by members of the Board of County Commissioners at both Commission meetings and Republican party functions. (Doc. 29 at 217–26, 235–39). While almost all of the Commissioners hugged and kissed her, Plaintiff found offensive the greetings of only Randy Morris, Darryl McClain and

---

**3.** In her response, Plaintiff does not dispute the information in this paragraph.

**4.** Plaintiff's Amended Complaint does not clearly state her causes of action.

Win Adams. *Id.* Plaintiff contends that their hugs were tighter and more intimate. *Id.* After telling them to cease their conduct, Morris complied; Plaintiff claims, however, that Adams and McClain did not. *Id.*

In 1993 or 1994, Plaintiff asserts that she told Grace that she did not like this behavior. Plaintiff did not identify any Commissioner by name. *Id.* at 226–27. Grace purportedly responded, "don't rock the boat, enjoy it." *Id.* Plaintiff did not voice any other concerns of a sexual nature with Grace. *Id.* Grace denied that Plaintiff ever approached him or that he ever made this statement. (Doc. 33 at 19).

Sometime after this alleged conversation with Grace, Plaintiff claims that on two occasions Adams touched her upper leg in an inappropriate way and that McClain "put his arms around [her] and proceeded to—to hug on [her] and put his hand on the back part of [her] dress, the leg, and up toward [her] hip." (Doc. 29 at 238–39, 241, 249). Plaintiff also alleges that she was sexually harassed by Van Pelt, Tom Lilly, Jim Wilson, Jerry Matthews, and Lonnie Groot. The only harassment committed by Van Pelt occurred in 1987 and 1992 and by Lilly occurred in 1992. *Id.* at 277, 400, 397. Wilson purportedly made a lewd comment to Plaintiff in 1992, 1995 and 1996. *Id.* at 253–55, 257. Plaintiff claims that Jerry Matthews always talked about his sex life and Lonnie Groot told her that she had pretty eyes and hugged her after she was released from the hospital. *Id.* at 364.

## II. Standard for Motion for Summary Judgment

Summary judgment is appropriate only when the Court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). In making this determination, the Court must view all of the evidence in a light most favorable to the non-moving party. *Samples on Behalf of Sam-*

ples v. Atlanta, 846 F.2d 1328, 1330 (11th Cir.1988). The moving party has the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Next, the "non-moving party ... bears the burden of coming forward with sufficient evidence of every element that he or she must prove." *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). To that end, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file', designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

## III. Analysis [5]

### A. Age Discrimination

In Count I of her Amended Complaint, Plaintiff alleges that she was terminated from employment because of her age in violation of "Title VII of the Civil Rights Act of 1967, which [is] ... applied to those persons such as Seminole County employees through the 1983 Civil Rights Act Amendments which make state action in performing a discretionary act a violation of Plaintiff's due process rights under the 14th Amendment of the United States Constitution." Defendant initially argues that this claim must fail because no cause of action exists under Title VII for age discrimination. The parties agree in their joint pretrial statement (Doc. 56) that the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.,* sets forth the exclusive remedy for claims of age discrimination in the workplace. Thus, for the purpose of this Order, the Court will construe Plaintiff's claim as one arising under the ADEA.

■ Defendant contends that the ADEA claim must be dismissed because Plaintiff failed to satisfy the conditions precedent to bringing suit. Pursuant to 29

---

**5.** Plaintiff's memorandum fails to address the    issues in a complete or clear fashion.

U.S.C. § 626(d), "[n]o civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission." Defendant asserts that Plaintiff never filed a charge with the EEOC. For support, Defendant submits a letter from the EEOC stating that it has no records of a charge filed by Plaintiff. (Doc. 28, Tab 17). Plaintiff responds that she filed a charge on August 14, 1997, and submits an affidavit outlining her allegations as well as certified receipts from an item mailed to the EEOC. (Doc. 39, Exh. 2). She also presents correspondence addressed to the EEOC. *Id.* However, Plaintiff did not file her copy of the charge and did not present evidence that she attempted to correct the error allegedly made by the EEOC. Even if Plaintiff filed her Charge of Discrimination on August 14, 1997, the charge would have been untimely because it was not filed more than sixty days prior to the filing of her lawsuit, which occurred on June 16, 1997. Accordingly, because Plaintiff failed to exhaust her administrative remedies, Defendant's motion for summary judgment is due to be granted as to the age discrimination claims.

Even if Plaintiff had exhausted her administrative remedies, she cannot establish that the County terminated her based on her age. Where, as here, the plaintiff attempts to use circumstantial evidence to demonstrate unlawful discrimination under the ADEA, courts apply the *McDonnell–Douglas* framework. *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 656 (11th Cir.1998). Initially, the plaintiff must establish a prima face case of discrimination. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.1998), *cert. denied*, — U.S. —, 119 S.Ct. 405, 142 L.Ed.2d 329 (1998). A plaintiff may establish a prima facie case by showing: "(1) that he was a member of the protected group of persons between the ages of forty and seventy; (2) that he was subject to adverse employment action; (3) that a substantially younger person

filled the position that he sought or from which he was discharged; and (4) that he was qualified to do the job for which he was rejected." *Id.* The employer must respond with legitimate, nondiscriminatory reasons for its actions. *Id.* Finally, "[i]n order to prevail, the plaintiff must establish that the employer's articulated legitimate, nondiscriminatory reason was a pretext to mask unlawful discrimination." *Id.*

Assuming that Plaintiff has established a prima facie case for age discrimination, Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's termination. Specifically, she was fired due to her falsification of time sheets, misuse of county time, insubordination, false statements, leaving assigned work area, personal use of County property, receiving improper gifts, and abusing County policies. (Exh. 4 at 13–15). Plaintiff does not address the issue of pretext in her memorandum and the record does not support an argument that the reasons were pretextual. In her deposition, Plaintiff conceded that she does not believe that had she been younger she would not have been terminated from employment. (Doc. 29 at 372). In addition, Plaintiff stated that she did not believe that Grace or Groot discriminated against her because of her age. *Id.* at 388–89. She believed that McCollum fired her because Grace told him to. *Id.* at 324. Furthermore, when asked why she thought that her age had something to do with her termination, she responded, "Just a feeling that I had." *Id.* at 374. Therefore, Plaintiff has failed to submit evidence demonstrating that she was fired based on her age.

Plaintiff's age discrimination claim must also fail because she cannot demonstrate that the reasons articulated for her termination were untrue. In her deposition, although she disagrees with the time of day, Plaintiff admits that she, Burke, O'Connor and some consultants worked on her son's campaign for about an hour on July 17. *Id.* at 479. In addition, she does not dispute the following: (1) that she,

Burke, and O'Connor were performing Plaintiff's personal business during the hours that someone was supposed to be at the County to answer questions (*id. at* 511); (2) that she made no effort to stop Burke or O'Connor from being paid eight hours on July 17 (*id.* at 521); (3) that she contacted O'Connor and specifically asked her a question about her statement to Groot and the investigation even though that she had been ordered not to contact any witness about the investigation (*id.* at 531); (4) that she picked up the satellite card for her son on County time with a County vehicle (*id.* at 552–56, 558); (5) that she received gifts from consultants (*id.* at 566–69, 575); and (6) that consultants ran personal errands for her (*id.* at 581–82).

Throughout her response, Plaintiff contends that she was treated differently from other employees because the policy regarding gifts was not enforced and because Burke was disciplined less harshly. Even if the gift policy was not enforced, Plaintiff was terminated for violating numerous policies. In addition, Plaintiff has not shown how Burke was similarly situated. McCollum suspended him for 5 days without pay and gave him special probation for 90 days. (Doc. 28, Tab 16). McCollum stated that Burke received the harshest discipline possible without being terminated and explained that Burke was not terminated because he was not a supervisor and Plaintiff probably pressured him. *Id.* at 48–49. Plaintiff has not submitted any evidence of other employees with supervisory responsibilities who committed similar offenses and were not terminated. Therefore, because Plaintiff has failed to meet her burden of establishing that Defendant's reasons for terminating her were a pretext for discrimination, summary judgment is due to be granted as to this claim.

### B. Substantive Due Process

■ In Count II, Plaintiff claims that Defendant violated her substantive due process rights in terminating her employment. However, as the Eleventh Circuit

determined in *McKinney v. Pate*, 20 F.3d 1550, 1564–65 (11th Cir.1994) (en banc), *cert. denied*, 513 U.S. 1110, 115 S.Ct. 898, 130 L.Ed.2d 783 (1995), an allegation of pretextual firing implicates only procedural due process concerns, and does not state a substantive due process claim. Therefore, summary judgment is due to be granted as to this claim.

### C. Procedural Due Process

In Count II, Plaintiff asserts that she was terminated from employment in violation of her right to procedural due process under the United States Constitution. In particular, Plaintiff alleges that her hearing was unfair because Defendant did not compel her witnesses to attend. In addition, Plaintiff alleges that her attorneys were not allowed to cross-examine Burke. Finally, Plaintiff claims that it was improper for Grace to chair the Appeal Hearing given his statement that he would have terminated Plaintiff if Sellers had not done so.

"The Supreme Court has explained that a 'tenured employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story' before a state or state agency may terminate an employee." *McKinney*, 20 F.3d at 1561 (quoting *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). "That hearing is not a mini-trial and 'need not definitely resolve the propriety of the discharge. It should be an initial check against mistaken decisions-essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Id.* (quoting *Loudermill*, 470 U.S. at 545–46, 105 S.Ct. 1487).

In this case, Plaintiff received written notice of the investigation on September 4, 1996. (Doc. 30, Exh. 6). During the investigation, Plaintiff was interviewed, and was allowed an opportunity to respond to

the interviews of other employees. Prior to her termination, McCollum provided her with a list of the formal charges and a copy of the Investigative Report conducted by Groot and Coto. (Exh. 4 at 11–39). She was provided an opportunity to respond to the formal charges, and did respond through counsel. Her attorneys met with Sellers and McCollum and they presented a seven page document and exhibits explaining why Plaintiff should not be terminated. Subsequently, the attorneys filed a supplemental document on Plaintiff's behalf. After this process, Sellers and McCollum made the final decision to terminate her.

Plaintiff appealed her decision to the Appeal Hearing Board. The County Human Resources Director sent notices to both parties' witnesses notifying them that they had been requested to appear at the appeal hearing. Prior to the hearing, Plaintiff submitted a statement of position and exhibits. At the hearing, Plaintiff was represented by counsel, cross-examined the County's witnesses and was given the opportunity to present her own. The Appeal Hearing Board issued a Recommended Summary of Findings and Determination and found that Plaintiff's termination was appropriate.

■ Plaintiff received the process due under *Loudermill.* While the right to call witnesses is basic to a fair hearing, Defendant had no duty to secure her witnesses for her. *See Black v. City of Auburn, Alabama,* 857 F.Supp. 1540, 1547 (M.D.Ala.1994) (stating that if employee desired persons to testify at the disciplinary hearing, it was incumbent on him to secure their presence), *aff'd,* 56 F.3d 1391 (11th Cir.1995). Rather, it was incumbent on Plaintiff to secure their presence. Plaintiff concedes that she is unsure whether her attorneys even contacted her witnesses to secure their appearance at the Appeal Hearing. (Doc. 29 at 120).

At her deposition, Plaintiff could not identify which procedures were not followed. (Doc. 29 at 173–75). Regarding the cross-examination of Burke, Plaintiff

cannot recall what questions were disallowed, whether the disallowed questions were relevant, the subject matter of the questions, or the number of questions disallowed. (Doc. 29 at 122–24).

■ Finally, Plaintiff's allegation of bias does not raise a procedural due process violation in this instance. "An allegation of bias may arise in either of two scenarios: in the first, the challenger learns of the decisionmaker's alleged bias prior to or during the proceeding; in the second, the challenger learns of the decisionmaker's alleged bias only after the proceeding has terminated." *McKinney,* 20 F.3d at 1561. In the first scenario, courts usually require that the challenger contemporaneously object to the bias. *Id.* In the second, "courts require that the challenger meet a threshold test of demonstrating harm or prejudice resulting from the alleged bias before they will reopen a closed case." *Id.* In this case, Plaintiff had an opportunity to object to the bias in her exceptions to the Board's Recommended Summary of Findings and Determination, but failed to do so. In addition, Plaintiff has not demonstrated any bias on the part of Grace. He was not a voting member of the Appeal Hearing Board and Plaintiff has no evidence that he influenced the Board in any way.

Even if Grace were biased, Plaintiff "has not suffered a violation of [her] procedural due process rights unless and until the State of Florida refuses to make available a means to remedy the deprivation." *Id.* at 1562. Plaintiff currently has pending in state court a petition for writ of certiorari seeking review of her termination proceedings. For these reasons, as a matter of law, Plaintiff's procedural due process rights have not been violated.

*D. Retaliation*

In Count III, Plaintiff alleges that she was terminated from employment based upon "sexual harassment and retaliation for refusal to accede to such harassment" which violated her right to "equal protection under the law ... as is applied to

state action pursuant to 42 U.S.C. § 1983." A plaintiff in a retaliation case must establish a prima facie case by showing that "(1) the plaintiff engaged in a statutorily protected activity; (2) the employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse action." *Berman v. Orkin Exterminating Co., Inc.,* 160 F.3d 697, 701 (11th Cir.1998) (citations omitted). "The third prong is satisfied if the evidence shows that the protected activity and the adverse action are not totally unrelated." *Id.* In the instant case, Plaintiff is unable to establish a prima facie case.

■ Plaintiff satisfies the first two prongs of the prima facie case because she alleges that she complained to Grace about the harassment and it is undisputed that she suffered an adverse employment action. However, no causal connection exists between the protected activity and the adverse action. The following individuals were involved in Plaintiff's termination: McCollum, Sellers, the individuals serving on the Appeal Hearing Board, and Kaiser. Plaintiff admits in her deposition that she was not retaliated against by any of these individuals.[6] (Doc. 29 at 281–82). Plaintiff further admits that she did not get fired because she complained to Grace. *Id.* at 262. In her deposition, Defendant asks Plaintiff if it is her position that she was terminated because she went to Grace. *Id.* She responds: "No. I feel I got fired for political reasons." *Id.*

Even though Plaintiff claims that Grace was aware of her complaint, he was not involved in the decision to terminate her. Grace was a member of the Appeal Hearing Board, but did not vote on the decision. Finally, Plaintiff allegedly complained to Grace about the Commissioners' conduct in 1993 or 1994, yet Plaintiff was not terminated until October 1996. Due to the period of time that elapsed between the protected activity and her termination, Plaintiff cannot establish a causal connection.

Even if Plaintiff could establish a prima facie case, as the Court previously discussed, Defendant has articulated legitimate, nondiscriminatory reasons for her termination and Plaintiff is unable to demonstrate that Defendant's reasons are merely a pretext for discrimination.[7] Accordingly, summary judgment is due to be granted as to this claim.

### E. Hostile Work Environment

In Count III, Plaintiff alleges that she was a victim of wrongful termination based on sexual harassment. Although this claim is better characterized as a claim for retaliation, as previously noted, Plaintiff has not shown any connection between her termination and the sexual harassment. She states that McCollum, Sellers, Rabun, Kaiser, and Grace never sexually harassed her or treated her differently based on her gender. (Doc.29 at 362–64). In addition, none of the individuals who are alleged to have sexually harassed Plaintiff, such as McClain or Adams, played a role in her termination. (Doc. 29 at 384). Plaintiff further concedes in her deposition that sexual harassment did not necessarily play a role in her termination. (Doc. 29 at 235). Therefore, because Plaintiff has submitted no evidence that her termination was

---

**6.** The following exchange took place:
  Q: Did Jerry McCollum ever take any retaliatory action against you?
  A: No.
  Q: Did Larry Sellers ever take any retaliatory action against you?
  A: No.
  Q: Did Burt Johnson ever take any retaliatory action against you?
  A: No.
  Q: Did Kevin Grace ever take any retaliatory action against you?

  A: I don't know.
    *   *   *   *   *   *
  Q: Did Gary Kaiser ever take any retaliatory action against you?
  A: No.
  *Id.*

**7.** If Plaintiff believed that she was retaliated against for complaining of sexual harassment, the Court questions why she did not raise this issue in her termination hearing.

based on sexual harassment, summary judgment is appropriate as to this claim.[8]

■ Plaintiff also alleges that she was subjected to a hostile working environment. To prevail on a hostile work environment claim under the Equal Protection Clause, Plaintiff must show that: (1) she belonged to the protected group at issue; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based upon her gender; (4) the harassment affected the conditions of her employment; (5) the defendant acted under color of law; and (6) the defendant acted with discriminatory purpose or intent. *Watkins v. Bowden*, 105 F.3d 1344, 1355 (11th Cir. 1997). Defendant argues that Plaintiff cannot establish that it acted under color of law.

Municipal liability may be based upon "(1) an action taken or policy made by an official responsible for making final policy in that area of the city's business; or (2) a practice or custom that is so pervasive, as to be the functional equivalent of a policy adopted by the final policymaker." *Church v. City of Huntsville*, 30 F.3d 1332, 1343 (11th Cir.1994). In this case, there is no evidence that Defendant had an official policy favoring sexual harassment. The County's policies expressly prohibited sexual harassment. (Doc. 29, Exh. 21). The policy defines sexual harassment, provides procedures for complaining of harassment, explains disciplinary actions, and outlines investigation methods. *Id.* In addition, the individuals that Plaintiff claims sexually harassed her, such as Van Pelt, Lilly, Wilson, Matthews, and Groot, did not have final policy-making authority for the County. Furthermore, neither Adams nor McClain, although members of the Board of County Commissioners, could have individually established County policy. *See id.* (stating that under Alabama law, the final policymaking authority rests with the entire five-member City Council and the

Mayor and there was no evidence that they delegated this authority to an individual council member).

■ Plaintiff's allegations, if true, do not rise to the level of a practice or custom. To establish a practice or custom, " 'it is generally necessary to show a persistent and widespread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality. Normally random acts or isolated incidents are insufficient to establish a custom or policy.' " *Id.* at 1344 (quoting *Depew v. City of St. Mary's, Georgia,* 787 F.2d 1496, 1499 (11th Cir.1986)). Plaintiff cannot demonstrate that sexual harassment is so persistent and widespread to constitute a custom of the County. In addition, the County did not have constructive or actual knowledge of the alleged harassment because Plaintiff unreasonably failed to take advantage of Defendant's published sexual harassment policy. The harassment policy provides in relevant part:

> Complaints or allegations of sexual harassment may be filed to the immediate supervisor, submitted to the Department Director or filed to the Employee Relations Director for review by the Sexual Harassment Review Board. Complaints or allegations of sexual harassment do not have to be filed through the chain of command.... **All complaints must be presented in writing, specifically identifying both the grievant and the alleged harasser, in order to be considered by the County Manager, Department Director, the Employee Relations Director, or the Sexual Harassment Review Board.**

(Doc. 29, Exh. 21) (emphasis supplied). Plaintiff admits that she did not follow this policy. *Id.* at 235. To put the County on notice, Plaintiff could have filed a written complaint, she could have put her conver-

---

**8.** In her memorandum, Plaintiff suggests that her supervisors and elected officials were involved in a conspiracy to terminate her to cover up the sexual harassment. However, this allegation arises from mere speculation and conjecture. Plaintiff offers no evidence supporting this theory.

sation with Grace in writing and sent a copy to Sellers, or she could have raised this issue during her investigation or before the Appeal Hearing Board. Accordingly, Plaintiff is unable to demonstrate that the County had knowledge of the sexual harassment.

Because Plaintiff does not submit evidence that sexual harassment is a custom or policy of the County, summary judgment is appropriate.

### F. Additional Claims

To the extent that Plaintiff alleges that she was terminated based on her gender, she has failed to establish discriminatory intent. As previously noted, Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's termination and Plaintiff has failed to put forth any evidence demonstrating that those reasons are not true, or that her gender caused the County to terminate her. In addition, Plaintiff specifically states in her deposition that she did not believe that Sellers, Rabun, Kaiser, or Grace discriminated against her based on her gender, and she did not believe that McCollum terminated her based on her gender. (Doc. 29 at 362–64). Therefore, summary judgment is due to be granted as to this claim.

Plaintiff claims that "it is a question of fact as to whether or not her termination of employment is based in part upon her political opposition to one or more of the elected officials of her employer. The fact that one of those elected officials had been her husband and from whom she suffered a bitter divorce and at whose hands she suffered physical and emotional abuse provide facts which a jury must hear to determine whether or not Plaintiff's termination was in part motivated by political reasons." (Doc. 38, ¶ 6). Plaintiff readily concedes that she has no proof to support this political conspiracy claim. (Doc. 29 at 273–75, 729–30). As Defendant correctly notes, this claim "is supported by nothing more than pure conjecture and speculation." Therefore, summary judgment is appropriate.

Finally, Defendant argues that because Plaintiff's claims are frivolous, unreasonable, and without foundation, Defendant should be awarded its reasonable attorney's fees. The Court declines to address this issue at this time. However, Defendant has leave to file a motion and supporting memorandum requesting attorney's fees within the time limits set forth in the Local Rules and the Federal Rules of Civil Procedure.

## IV. Conclusion

Based on the foregoing, it is ORDERED as follows:

1. Defendant's Motion for Summary Judgment (Doc. 27), filed November 20, 1998, is GRANTED.

2. Plaintiff's Motion for Reconsideration (Doc. 70), filed March 15, 1999, is DENIED AS MOOT. Counsel should be aware, however, that due to the inordinate amount of cases filed in the Middle District of Florida, his case may be tried at any location in the District when a judge is available.

3. The Clerk is directed to enter final judgment in favor of the Defendant providing that the Plaintiff shall recover nothing on her claims and that Defendant shall recover costs.

4. All pending motions are DENIED AS MOOT.

5. This case is removed from the April 1999 trial calendar.

6. The Clerk is directed to close this case.