Cheryl **EBELT**, Plaintiff,

v.

The **COUNTY OF OGEMAW**, Ronald Knight, and Clyde Sheltrown, Defendants.

No. 01–10093–BC.

United States District Court, E.D. Michigan, Northern Division.

Sept. 30, 2002.

Victor J. Mastromarco, Jr., Russell C. Babcock, Cady, Mastromarco, Saginaw, MI, for plaintiff.

Ruth E. Mason, Cohl, Stoker, Lansing, MI, Michael R. Kluck, Michael R. Kluck Assoc., Okemos, MI, Gary J. Goodman, Chasnis, Dogger, Saginaw, MI, for defendants.

### OPINION AND ORDER ADOPTING MAGISTRATE JUDGE'S RECOMMENDATION IN PART, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, AND SCHEDULING STATUS CONFERENCE

LAWSON, District Judge.

This matter is before the Court for a *de novo* review of the defendants' motions for summary judgment following a recommendation by Magistrate Judge Charles E. Binder that the motions be granted and this case dismissed. The motions were referred for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and E.D.Mich.LR 72.1. The plaintiff filed objections and the Court has reviewed the matter. The Court finds that although the Magistrate Judge correctly determined that the plaintiff stated no valid state law claim against any defendant, the report erroneously concludes that the plaintiff's civil rights claims brought under 42 U.S.C. § 1983 are not trial-worthy. The plaintiff has stated a valid discrimination claim based on sexual harassment against defendant Knight, and valid retaliation claims against defendants Knight, Sheltrown, and Ogemaw County, all arising from federal constitutional violations and all requiring a trial for resolution. The Court, therefore, will adopt the magistrate judge's recommendation in part and dismiss the state law claims, and reject it in part. The defendants' motions seeking dismissal of the plaintiff's federal claims will be denied.

### I.

This case arises from the plaintiff's tenure as a custodian at the Ogemaw County Building. The plaintiff began working there in 1997 as an employee for Crystal Clean Janitorial Services. During that time, she testified that she was subject to several unwelcome advances by defendant Knight, including vulgar comments, gestures, and undesired touching. The plaintiff complained to her boss, who told her that she should be able to handle it herself. The plaintiff did not report the conduct to the Michigan Department of Civil Rights until 1999.

In April 1999, the owner of Crystal Clean decided not to seek renewal of his contract with the County, and encouraged the plaintiff to bid for the contract herself. The plaintiff established a proprietorship known as Cheryl's Cleaning Company and submitted a bid to the County for cleaning services, which was accepted. During the time between the submission of her bid and its acceptance in July 1999, the plaintiff alleges that Knight approached her in a hallway and made a lewd reference to his size of his genitalia. She promptly reported the incident to the Clerk of Court.

After she received the cleaning contract, the plaintiff alleges that Knight's harassment took the form of subverting her work effort. He was one of two commissioners who voted against awarding the cleaning contract to the plaintiff in September 1999. The plaintiff also testifies that she soon noticed a pattern of coffee spills on rugs and urine on the floor of the men's bathroom after her company had cleaned those areas. On one day in particular, the plaintiff states that she specifically observed defendant Knight enter a bathroom she had just cleaned, and that after he left, she discovered urine all over the floor.

Shortly after the plaintiff was awarded the cleaning contract, the plaintiff testified

that she was approached by defendant Clyde Sheltrown, also an Ogemaw County Commissioner, who apologized to her for the treatment she had been receiving and claimed that defendant Knight "would be out to make [her] life hell." Pl.'s Dep. at 55.

The Ogemaw County Board renewed the plaintiff's contract in September 2000. Defendant Knight, along with one other commissioner, voted against renewing the contract, claiming that the job should be performed by union employees. After the contract was renewed, the plaintiff alleges that defendant Sheltrown grabbed her and threatened that the Board would not renew her contract again unless she dropped her civil rights complaint against defendant Knight. He asserted that rather than merely cancelling her contract, they would simply stop outsourcing the work altogether.

The plaintiff filed her complaint in this Court in February 2001, approximately six months into the second year of her contract with the County. The complaint alleges claims against Ogemaw County and defendants Knight and Sheltrown in their official and individual capacities. On September 12, 2001, the Ogemaw County Board of Commissioners voted to no longer solicit or accept bids for janitorial services, but rather to begin immediately to have union employees of the County to perform the work. The plaintiff alleges that she was informed one-and-a-half hours before she was planning to show up to work on the 12th of September that she was out of a job.

The plaintiff alleges that she has suffered considerable economic injury and that the termination of her contract was a pretext for discrimination against her, and constitutes retaliation for complaining about the sexual harassment visited upon her by Knight.

## II.

A motion for summary judgment under Fed.R.Civ.P. 56 presumes the absence of a genuine issue of material fact for trial. The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court is required to take the plaintiff's properly supported factual assertions as true for the purposes of this summary judgment motion. *See Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994).

█ The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record which demonstrate the absence of a genuine dispute over material facts. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Univ., Inc.*, 276 F.3d 845, 848 (6th Cir.2002). The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir.1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The central issue is

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. 2505.

█ A summary judgment motion is not a trial by affidavits; the Court's sole function is to determine if there is a genuine issue for trial. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Furthermore, summary judgment is unlikely to be appropriate when motive and intent are at issue and where most of the evidence is in possession of the alleged wrongdoers. *Perry v. McGinnis,* 209 F.3d 597, 600 (6th Cir. 2000). If a jury reasonably could return a verdict for the plaintiff, then a genuine dispute of material fact exists and summary judgment may not be granted. *Satterfield v. State of Tenn.,* 295 F.3d 611, 615 (6th Cir.2002).

### A.

█ The plaintiff brought her action against defendants Knight and Sheltrown in both their individual and official capacities. The magistrate judge correctly determined that suit against the individual defendants in their official capacities was duplicative of the suit against the County itself, and recommended that the official capacity claims be dismissed as redundant. *See Vance v. County of Santa Clara,* 928 F.Supp. 993, 996 (N.D.Cal.1996). The parties did not object to this recommendation, and it will be adopted. The action against defendants Knight and Sheltrown in their official capacities will be dismissed.

### B.

█ The magistrate judge recommended dismissal of the plaintiff's harassment and retaliation claims against defendant Knight, finding that Knight was entitled to qualified immunity. The defense of qualified immunity is designed to protect public officials from liability in an atmosphere of evolving constitutional rights. When a government actor performs a discretionary function, civil liability for damages will not emerge if the actor's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Qualified immunity provides "ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Scott v. Clay County, Tenn.,* 205 F.3d 867, 873 n. 9 (6th Cir.2000).

The Supreme Court has directed lower courts to analyze the qualified immunity affirmative defense in two, sequential stages. *See Saucier v. Katz,* 533 U.S. 194, 200–01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). First, it must determine whether the facts alleged, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right in the context of the facts presented. *Id.* at 201, 121 S.Ct. 2151. Second, if and only if a potential constitutional violation is found, the Court proceeds to determine whether the party's right to be free from the violation was "clearly established" at the time of the violation such that a reasonable officer would understand that it as such. *Ibid.*

█ The plaintiff has the burden of demonstrating that government officials are not entitled to qualified immunity. *Blake v. Wright,* 179 F.3d 1003, 1007 (6th Cir.1999). Even if the government actor's conduct is found to be unconstitutional, there will be no liability if the unlawfulness

of the conduct is marginal, or finds its place at a new evolutionary turn in the jurisprudence. *Gragg v. Kentucky Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir.2002). The threshold requirement of being clearly established is quite high. "For the right to be clearly established the case law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Ibid.* (citation omitted). In other words, government officials deserve "fair warning" that certain conduct is unconstitutional. *United States v. Lanier*, 520 U.S. 259, 265, 270–71, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

In the context of this case, the record justifies a conclusion that defendant Knight behaved quite poorly toward the plaintiff. According to the plaintiff, Knight at various times forced himself up against Ms. Ebelt, grabbed her breasts, forcibly licked her face, and made crude sexual advances. When the plaintiff reacted with revulsion rather than attraction to this conduct, Knight allegedly altered his strategy from seduction to sabotage by soiling portions of the building Ms. Ebelt was charged with cleaning and eventually causing the county board to eliminate the contractor's position altogether. The plaintiff's direct evidence must be taken as true and, as noted above, reasonable inferences must be drawn in the light most favorable to the plaintiff. *See Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir.1994).

If these allegations are true, Knight's conduct can be characterized as repulsive and, most likely, criminal. *See* Mich. Comp.Laws § 750.520e (fourth-degree criminal sexual conduct). The question presented by Knight's qualified immunity defense is whether the conduct also violated Ms. Ebelt's constitutional rights, and if so, did Knight have fair warning, that is to say, "could he fairly be said to 'know' that the law forbade [such] conduct." *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. The magistrate judge answered these questions in the negative by borrowing the jurisprudence developed in sexual harassment cases brought under Title VII of the Civil Rights Act of 1964. *See, e.g., Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 794 (6th Cir.2000). A fact crucial to the magistrate judge's analysis is that the plaintiff was not an employee of the county, but rather an independent contractor (a conclusion with which this Court agrees, given the undisputed evidence on the matter). Since no court has found an independent contractor entitled to relief under Title VII, *see, e.g., Eyerman v. Mary Kay Cosmetics, Inc.*, 967 F.2d 213, 218–19 (6th Cir.1992), the magistrate judge concluded that the plaintiff had no clearly established constitutional right to be free of harassment and adverse consequences for reporting similar conduct enforceable under Section 1983.

■ The Court disagrees with these conclusions. First, the plaintiff had a constitutional right under the Fourteenth Amendment to be free from sexual harassment by a government official and under the First Amendment to be free from retaliation for reporting it. It has been well established in this Circuit for well over a decade that the Equal Protection Clause protects individuals from sexual harassment by their supervisors. *Poe v. Haydon*, 853 F.2d 418, 430 (6th Cir.1988). No decision on this matter within this Circuit has explicitly left open the question of whether independent contractors somehow receive less protection from their supervisors. Although Title VII was passed, in part, on the authority of Congress's enforcement powers under Section 5 of the Fourteenth Amendment, *see NAACP, Detroit Branch v. Detroit Police Officers*

*Ass'n,* 900 F.2d 903, 912 (6th Cir.1990), this Circuit has also made it clear that statutory limitations on relief under Title VII do not diminish relief independently available under the Equal Protection Clause. *Day v. Wayne County Bd. of Auditors,* 749 F.2d 1199, 1204–05 (6th Cir. 1984). The Equal Protection Clause protects independent contractors from a public official's attempts to extract sexual favors or sexually harass them in exchange for awarding or not interfering with an existing government contract.

■ Likewise, the Constitution protects citizens from retaliation by public officials for complaining about violations of their civil rights. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). This protection from retaliation is independent from supplemental schemes established by Title VII and other remedial civil rights statutes. *See Thaddeus–X v. Blatter,* 175 F.3d 378, 386–87 (6th Cir.1999) (en banc). Retaliation for filing an administrative complaint that is a predicate for suit violates the First Amendment. *See De-Walt v. Carter,* 224 F.3d 607, 618 (7th Cir.2000) (holding that termination of prisoner's job in response to his filing of a grievance was unconstitutional retaliation for exercise his right of access to the Courts). More broadly, retaliation against a citizen for exercising her First Amendment rights in almost any circumstance violates the Constitution. *See McCurdy v. Montgomery County, Ohio,* 240 F.3d 512, 520 (6th Cir.2001) (retaliation against plaintiff by police officer for the plaintiff's rude comments violated his First Amendment rights).

The magistrate judge did not consider the availability of relief under the First Amendment for retaliation. The plaintiff's briefs provided little guidance on this issue, however "it is the district court's responsibility to apply the proper legal standard, regardless of the misconceptions by the parties." *Hollister v. Dayton Hudson Corp.,* 201 F.3d 731, 737 (6th Cir.2000). Here, the facts brought forth by the plaintiff have made out a case for First Amendment retaliation.

Because Ebelt was an independent contractor employed by the county, and because the retaliation alleged was termination of her employment, her speech will only be protected if it touched matters of public concern and outweighed the county's interest in a harmonious work environment. *See Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr,* 518 U.S. 668, 677–78, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (extending First Amendment protection to speech by independent contractors whose contracts are not renewed because of retaliation). Because the alleged retaliation implicates the county's interest as *contractor* rather than *sovereign,* the government is entitled to deference for any "reasonable assessments of its interests." *Id.* at 678, 116 S.Ct. 2342.

■ In this Circuit, there are three fundamental elements to a First Amendment retaliation claim. The plaintiff must prove that she "was engaged in a constitutionally protected activity," "that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity," and "that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights." *Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir.1998). To demonstrate that her speech was constitutionally protected, Ebelt must first show that (1) her speech addressed matters of public concern and (2) her interest in speaking as she did outweighed the defendants' interests in keeping her silent. *Bonnell v. Lorenzo,*

241 F.3d 800, 809 (6th Cir.2001) (citing *Connick v. Myers*, 461 U.S. 138, 147–50, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). The inquiry into whether the speech was of public concern is one for the Court. *Id.* at 809–10 (citing *Rankin v. McPherson*, 483 U.S. 378, 383 & 386 n. 3, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). The weighing of interests is a factual question for the jury. *Id.* at 810 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). The factors to be considered in weighing the parties' respective interests include "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. If Ebelt's interests outweigh those of the defendant, then her First Amendment rights were violated. *Bonnell*, 241 F.3d at 810.

The determination of whether speech is about a matter of public concern involves an examination of the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 812 (citing *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684). As for the content, complaints about sexual harassment are "well-settled ... matters of public concern." *Ibid.* (holding that college professor's distribution of sexual harassment complaint filed against him around campus concerned a matter of public concern); *Azzaro v. County of Allegheny*, 110 F.3d 968 (3d Cir.1997) (en banc). In *Azzaro*, the court found that a sexual harassment complaint, even if it concerned only the worker's own private experience, was inherently a matter of public concern unless the form and content of the complaint somehow dictated otherwise. *Id.* at 978–79. *Azzaro* relied heavily on *Connick's* admonition that speech would

be of public concern if it indicated that a public official was not discharging his duties properly or was abusing the public trust. *Id.* at 978 (citing *Connick*, 461 U.S. at 148, 103 S.Ct. 1684). Because a supervisor's sexual harassment obviously fell into this category, and because there was nothing otherwise remarkable about the form or content in which the complaint was made, the Third Circuit determined that the plaintiff's sexual harassment complaint was one of public concern. *See also Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 601 (6th Cir.2002) (noting that the plaintiff's speech, even if focused solely on her own problems, was still of public concern to the extent it suggested that the Commissioners of the City of Cleveland were denying promotions on the basis of race).

*Azzaro* similarly found that the balancing of the plaintiff's interests in speaking versus the government's interest in her silence weighed in favor of the plaintiff:

> Striking the appropriate balance in this case is not difficult. It is true that Azzaro's revelations were apparently not about systemic gender discrimination, as were Ms. Givhan's complaints about racial discrimination. Nevertheless, as we have explained, there is a substantial public interest in Azzaro's revelations because they were relevant to an evaluation of the performance of the office of an elected official. We conclude that this public interest is clearly sufficient to outweigh any legitimate countervailing governmental interest that might have been implicated here, if any such interest there be.

*Id.* at 980. The Court also noted that the plaintiff and the accused did not work together, which precluded concerns about workplace harmony and efficiency. *Ibid.* Because the plaintiff's speech was a matter

of public concern, the plaintiff was entitled to take her case to trial.

■ In this case, the plaintiff's complaint to the Michigan Department of Civil Rights was of public concern. It concerned sexual harassment, which is protected speech because it suggests that an elected county official was violating the public trust and behaving improperly. *See Azzaro,* 110 F.3d at 978. Sexual harassment itself is inherently a matter of public concern, regardless of its context. *See Bonnell,* 241 F.3d at 812. The form and context of the plaintiff's complaint, which was brought to her Congressman and promptly forwarded to the Michigan Department of Civil Rights, provides no reason to withdraw First Amendment protection from Ms. Ebelt's speech. *See Azzaro,* 110 F.3d at 978–79. A jury could conclude that her interests outweighed those of the County. As *Azzaro* notes, a valid complaint of sexual harassment will outweigh almost any governmental interest, legitimate though it may otherwise be. *Id.* at 980. The evidence suggests no such interests here. No problems in the efficiency or efficacy of county employees have been suggested as a result of Ebelt's complaints.

■ As to the second element, the Court finds that losing one's contract with a municipality "would likely chill a person of ordinary firmness from continuing to engage" in protected conduct. *See Lucas v. Monroe County,* 203 F.3d 964, 974 (6th Cir.2000) (removing tow-truck operator from county's "call list" would have chilling effect). A jury could conclude that the decision not to renew the plaintiff's contract was motivated at least in part by a desire to retaliate for her complaint to the Michigan Department of Civil Rights.

Once the plaintiff's speech has been demonstrated to be protected, she must show that "the First Amendment violation was a substantial or motivating factor" in the defendants' decision not to renew her contract. *Bonnell,* 241 F.3d at 810 (citing *Mt. Healthy,* 429 U.S. at 285, 97 S.Ct. 568). If the decision was motivated by the First Amendment violation, the defendants may vindicate their decision by presenting evidence that they would have taken the same action in the absence of the protected conduct. *Ibid.* The magistrate judge observed that a single commissioner cannot make a decision for the entire board, an argument that is addressed in more detail below. Here, it is sufficient to observe that defendant Sheltrown told the plaintiff after she filed her civil rights complaint that Knight was "out to make [her] life hell," and that her contract would never be renewed if she did not drop her complaint. The plaintiff has offered sufficient evidence on all the elements of her retaliation claim against defendant Knight and has established that her constitutional rights were violated.

■ The defendant also argues that the plaintiff never sought to renew her contract. It would indeed be quite unreasonable to accuse the defendant of retaliating by refusing to grant a request that was never made. A similar argument was recently addressed by the Eleventh Circuit in *Mangieri v. DCH Healthcare Authority,* 304 F.3d 1072 (11th Cir.2002). In that case, the court ruled as a matter of law that even if the plaintiff, an independent contractor, does not apply to have his or her contract renewed, a claim for retaliation still may lie for "termination" as long as some pre-existing relationship exists. *Id.* at 1074–76. In this case, the contract appears to have expired by its own terms on September 9, 2001. However, the plaintiff testified at her deposition that although she did not put in a formal request to renew the contract, she assumed it would be renewed because no requests for bids had been published in the newspa-

per. Pl.'s Dep. at 105. In fact, she was not informed that her contract had been cancelled until an hour and a half before she was going to show up on the following Monday. *Id.* at 105–06. Therefore, the question of whether the contract would have been renewed in any event is one of fact for the jury. Similarly, while the plaintiff's failure to specifically request the renewal of her contract may suggest that the same decision would have been made in any event, this, too, is a jury question.

■ These constitutional rights were also clearly established at the time such that Knight had fair warning that his conduct was illegal. Although there is no decision in this Circuit finding a violation of constitutional rights of an independent contractor who complains of sexual harassment by an elected supervisory official, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002). As the Supreme Court explained in *Lanier:*

> In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular type of conduct at issue, a very high degree of prior factual particularity may be necessary. But general statements of the law are not inherently incapable of giving fair and clear warning, and in other instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.

*Lanier,* 520 U.S. at 270–71, 117 S.Ct. 1219. *See also Stemler v. City of Florence,* 126 F.3d 856, 867 (6th Cir.1997) ("The fact that the law may have been unclear, or even hotly disputed, at the margins does not afford state actors immunity from suit where their actions violate the heartland of the constitutional guarantee, as that guarantee was understood at the time of the violation.").

The Court finds no basis upon which a reasonable governmental official could conclude that harassing an independent contractor and retaliating against her for complaining about it would not violate the First and Fourteenth Amendments. Sexual harassment by government officials was clearly condemned by the court of appeals in 1988. *Poe,* 853 F.2d at 430. Nor does Ebelt's status as an independent contractor lessen her protection under the Constitution from discrimination and retaliation by her superiors. If anything, the case law suggests quite the opposite. *See, e.g., Umbehr,* 518 U.S. at 678–79, 116 S.Ct. 2342 (finding, in the First Amendment context, that exempting independent contractors from First Amendment protection "would leave First Amendment rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services," and expressing concern that such titles "can be manipulated largely at the will of the government agencies concerned").

The Court finds that the plaintiff has stated a valid claim against defendant Knight. Knight is not entitled to qualified immunity. His motion for summary judgment will be denied.

### C.

■ The magistrate judge also recommended that the complaint be dismissed as to defendant Sheltrown because there was no clearly established constitutional right against retaliation for filing the complaint with the Michigan Department of Civil Rights. The Court disagrees with this conclusion as to this defendant as well.

A jury reasonably could conclude that the decision not to renew the plaintiff's

contract was motivated at least in part Sheltrown's desire to retaliate against her for her complaint to the Michigan Department of Civil Rights. The plaintiff testified that after her contract was renewed in September 2000, defendant Sheltrown threatened her. He approached her in a hallway of the County Building, placed his hand on her shoulder, and squeezed it. The plaintiff testified that Sheltrown said:

> if you don't drop this civil rights complaint with Ron Knight, your contract will never be renewed, and I said, but how can you do that? That is not right. He said, we will never bid it out again to no one [sic]. You will miss that big money that you were making. And his voice was quivering and shaking.

Pl.'s Dep. at 53. The plaintiff's contract expired on September 9, 2001, and on September 12, 2001, the board voted to no longer accept bids for janitorial services, relegating the duties instead to union employees of the County.

The magistrate judge correctly noted that Sheltrown is merely one member of a seven-member board. That does not change the fact, however, that Sheltrown explicitly warned Ebelt that she would lose her contract if she did not drop her complaint, and that the work would be given to union employees instead. After the plaintiff not only refused to drop her complaint but also filed suit, the County Board did exactly what Sheltrown said it would do. The County Board voted to cancel the contract on the same basis that it had twice rejected in previous years by a 5–2 vote. Sheltrown clearly suggested that he was communicating the position of the Board on the issue, and a reasonable jury could conclude that he was not merely bluffing.

The plaintiff's right to be free from retaliation under these circumstances was clearly established under the First Amendment, as discussed above. Defendant Sheltrown is not entitled to qualified immunity and his motion for summary judgment will be denied.

### ·D.

The magistrate judge found that the plaintiff had demonstrated no policy or custom of Ogemaw County that could have violated the plaintiff's civil rights. He noted that the plaintiff pointed to no county law or regulation as the basis for her claim, and also suggested that the contrary votes of two commissioners on a seven-member board was insufficient to establish policy of the county as a whole. He found defendant Knight also could· not have established a custom by himself because he was not a final policymaker for the board, just a voting member. *See Suber v. Seminole County,* 78 F.Supp.2d 1298, 1309 (M.D.Fla.1999) (finding that actions of individual commissioners were not county policy or custom without ratifying vote or proof that authority had been delegated to the individual commissioner).

In her objections, the plaintiff asserts that the board can be held liable for its termination of the plaintiff's contract because even the action of a single policymaker is enough to constitute a policy. *See Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993). The plaintiff also claims that the board adopted a custom by "knowledge and acquiescence," citing *Beck v. City of Pittsburgh,* 89 F.3d 966, 971 (3d Cir.1996), specifically by adopting the threat of defendant Sheltrown not to renew her contract if she pursued her civil rights claim against defendant Knight.

It is axiomatic that municipalities cannot be held liable for the actions of their employees solely on the basis of *respondeat superior. Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 691, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, any violation of the plaintiff's

rights is only traceable to the municipality if brought about by a policy, practice, or custom that was the "moving force" behind the plaintiff's injury. *Ibid.*

The *Feliciano* decision, cited by the plaintiffs, provides a helpful summary of the Supreme Court's rulings on the "single policymaker" doctrine:

> In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) [*sic*] the Supreme Court held that a municipality can be held liable under § 1983 for a single decision by the municipality's policymakers. *Id.* at 479–80, 106 S.Ct. 1292. However, the municipality is liable for an official's unconstitutional action only when the official is the one who has the "final authority to establish municipal policy with respect to the action ordered." *Id.* at 481, 106 S.Ct. 1292 (plurality opinion). Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion). Officials can derive their authority to make final policy from customs or legislative enactments, or such authority can be delegated to them by other officials who have final policymaking authority. *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292 (plurality opinion). To determine whether final authority to make municipal policy is vested in a particular official, we must resort to state law. *Praprotnik*, 485 U.S. at 125, 108 S.Ct. 915 (plurality opinion); *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir.1989). This includes "state and local positive law," such as statutes, ordinances, and regulations, and less

formal sources of law such as local practice and custom. *Jett,* 491 U.S. at 737, 109 S.Ct. 2702; *Mandel,* 888 F.2d at 793.

*Feliciano,* 988 F.2d at 655. In *Feliciano,* the plaintiffs asserted that the City of Cleveland was liable for the decision made by Chief of Police to order drug testing. Thus, in order to establish liability, the plaintiffs needed to demonstrate that the Chief of Police was either a final policymaker, or that his actions were subsequently ratified by the city's final policymaker. Because the Chief of Police was subordinate to the Director of Public Safety, he was not a final policymaker. Furthermore, no ratification existed. Mere acquiescence in the conduct was not enough, the court found, as that standard would essentially indirectly impose *respondeat superior* liability. *Id.* at 656. Although the final policymaker had fired the plaintiffs as a result of the drug tests, he had not expressly approved the policy that led to those tests. *Ibid.* Thus, no municipal liability would lie.

To establish her alternative theory that a "custom" of retaliation was adopted, the plaintiff must demonstrate "a 'legal institution' not memorialized by written law." *Doe v. Claiborne County, Tenn.,* 103 F.3d 495, 507–08 (6th Cir.1996). "A 'custom' for purposes of *Monell* liability must be so permanent and well settled as to constitute a custom or usage with the force of law. In turn, the notion of 'law' must include deeply embedded traditional ways of carrying out state policy. It must reflect a course of action deliberately chosen from among various alternatives." *Ibid.* (internal quotations and citations omitted).

*Pembaur* conclusively establishes that a single act by a municipality's highest decisionmaker—which the parties agree in Ogemaw County is the Board of Commissioners—establishes "policy" for the purpose of municipal liability under 42 U.S.C.

§ 1983. *Pembaur,* 475 U.S. at 480; 106 S.Ct. 1292 ("No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body— whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy."). If defendant Sheltrown's threat had merely been that *he* would refuse to vote to renew the plaintiff's contract, the defendants' position might be more tenable. Then, the plaintiff would still have to explain the motivations of at least three other board members. That is not, however, what Sheltrown allegedly said. Rather, he told Ebelt that *the Board* would not renew her contract, and the Board subsequently did exactly what Sheltrown said they would do if Ebelt did not retract her complaint. If the refusal to renew the contract was in retaliation for the plaintiff's complaints about Knight's sexual harassment, the board is also liable for refusing to renew the plaintiff's contract. *See Board of County C'mmrs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward."). Because the refusal to renew the plaintiff's contract was a one-time event, however, it cannot seriously be considered a long-standing custom of the board.

The Court concludes, therefore, that although the plaintiff has not presented facts to create a genuine issue on the question of official custom, Ogemaw County may be liable for retaliation on the basis of a policy reflected by the single event of not renewing the plaintiff's contract. A factual issue is presented here that precludes summary judgment.

## E.

The complaint also alleges claims against both Knight and Sheltrown under the Elliott–Larsen Civil Rights Act, Mich. Comp.Laws § 37.2101, and the Michigan Whistleblower Protection Act, Mich.Comp. Laws § 15.362, which the magistrate judge recommended be dismissed. The basis for this recommendation is that these statutes create no protection for an independent contractor; they protect only employees.

■ The Court agrees. Neither the Elliott–Larsen Civil Rights Act nor the Michigan Whistleblower Protection Act applies to independent contractors. *See Falls v. Sporting News Pub'g Co.,* 834 F.2d 611, 613 (6th Cir.1987) (Civil Rights Act); *Chilingirian v. City of Fraser,* 194 Mich. App. 65, 68–69, 486 N.W.2d 347, 349 (1992) (Whistleblower Protection Act). Because there has been no intervening state law decision since *Falls* to suggest that the Civil Rights Act *does* cover independent contractors, this Court is bound by that decision. *Perez v. Brown & Williamson Tobacco Corp.,* 967 F.Supp. 920, 925–26 (S.D.Tex.1997). Furthermore, the Michigan Court of Appeals' similar determination with respect to the Whistleblower Protection Act is also binding on this Court, in the absence of clear evidence that the Michigan Supreme Court would reach a different result. *Ziebart Int'l Corp. v. CNA Ins. Cos.,* 78 F.3d 245, 250–51 (6th Cir.1996).

There can be little doubt that the plaintiff did not enjoy employee status. For the reasons stated by the Magistrate Judge, she was clearly an independent contractor under the "economic realities" test utilized by the Michigan courts. *See Falls,* 834 F.2d at 614; *Williams v. Cleveland Cliffs Iron Co.,* 190 Mich.App. 624, 627, 476 N.W.2d 414, 416 (1991); *McKissic v. Bodine,* 42 Mich.App. 203, 201 N.W.2d 333 (1972). The magistrate judge's recom-

mendation that the plaintiff's state-law claims should be dismissed is correct and will be adopted.

## III.

The plaintiff has stated claims under 42 U.S.C. § 1983 on which there are material fact disputes warranting trial against all the defendants based on both the First and Fourteenth Amendments. The plaintiff's state-law claims lack merit as a matter of law.

Accordingly, it is **ORDERED** that the Magistrate Judge's Report and Recommendation is **ADOPTED IN PART AND REJECTED IN PART.**

It is further **ORDERED** that the motion of defendants Ogemaw County and Clyde Sheltrown for summary judgment [dkt # 44] is **GRANTED IN PART AND DE- NIED IN PART.** All claims against defendant Sheltrown in his official capacity, and the state-law claims against these defendants, are **DISMISSED.**

It is further **ORDERED** that the defendant Knight's Motion for Summary Judgment [dkt # 40] is **GRANTED IN PART AND DENIED IN PART.** The state-law and federal official capacity claims against defendant Knight are **DISMISSED.**

The federal sexual harassment and retaliation claims against defendant Knight and Sheltrown in their individual capacities, and the federal claim against Ogemaw County, will proceed to trial.

It is further **ORDERED** that the parties shall appear for a status conference on **October 21, 2002 at 10:00 A.M.** to determine a schedule for further proceedings in this matter.